# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | |
|---|---|
| ANNE L. DOBERSTEIN, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) C.A. No. 9995-VCP |
| | ) |
| G-P INDUSTRIES, INC., a Delaware corporation, | ) |
| DAVID GREENPLATE, SR., | ) |
| | ) |
| Defendants. | ) |


## MEMORANDUM OPINION

Date Submitted: July 10, 2015
Date Decided: October 30, 2015


Donald L. Logan, Esq., LOGAN & PETRONE, LLC, Wilmington, Delaware; *Attorneys for Plaintiff*.

Patrick McGrory, Esq., TIGHE & COTTRELL, P.A., Wilmington, Delaware; *Attorneys for Defendants*.


**PARSONS, Vice Chancellor.**

This is primarily a breach of contract action seeking damages for failure to perform under a residential renovation agreement. The plaintiff hired the defendants to substantially remodel her recently purchased residence, but the defendants suffered significant financial trouble and abandoned the project before completion. The plaintiff advances a number of theories of recovery, including fraud, intentional and negligent misrepresentation, breach of contract, and unjust enrichment. The defendants moved to dismiss three of the complaint's counts under Court of Chancery Rule 12(b)(6) for failure to state a claim and the remaining three counts along with the complaint entirely under Rule 12(b)(1) for lack of subject matter jurisdiction. For the reasons set forth below, I conclude that the plaintiff has not stated a claim upon which relief can be granted as to the first three counts and that this Court lacks subject matter jurisdiction over the remaining three counts. I therefore grant the defendants' motion and dismiss the complaint.

## I.    BACKGROUND[1]

### A.    Parties

Plaintiff, Anne L. Doberstein, is an individual who primarily works and resides in Switzerland. Doberstein also owns a residence located at 103 East Pembrey Drive in Wilmington, Delaware.

---

[1]    The facts recited herein are drawn from the allegations of the plaintiff's Verified Complaint (the "Complaint"). Those allegations and facts drawn from documents integral to the Complaint are presumed true for purposes of Defendants' motion to dismiss.

1

Defendant G-P Industries, Inc. ("G-P") is a Delaware corporation that provides general contracting and altering and remodeling services in Wilmington, Delaware. Defendant David Greenplate, Sr. is the president and registered agent of G-P. G-P and Greenplate are referred to, collectively, as "Defendants."

## B. Facts

### 1. Doberstein hires G-P to renovate her house

In October 2012, Doberstein entered into a contract with G-P (the "Agreement"), under which G-P agreed to serve as the general contractor on a significant home renovation project at Doberstein's Wilmington residence (the "Project"). On October 17, 2012, Greenplate, on behalf of G-P, prepared the Project's estimates and the Agreement. He estimated that the Project would cost Doberstein a total of $494,498.[2] Under the terms of the Agreement, Doberstein was to provide advance deposits for subcontractors performing work on the basement as well as for the building permit. Otherwise, the Agreement did not contemplate Doberstein paying for any renovations before they were completed or paying subcontractors directly. Instead, G-P was to pay all subcontractors and to seek reimbursement through its invoices to Doberstein. In addition, G-P agreed to invoice Doberstein on the first of each month—with the exception of major material purchases, which were to be invoiced immediately—and to provide a three percent

---

[2] Although they agree that the estimated $494,498 was the initial amount of the Agreement, the parties dispute the final amount covered by the Agreement. Based on the allegations in the Complaint and taking into account the additional $47,662 in supplemental estimates and change orders, I assume for purposes of this motion that the total amount of the Agreement was $542,159. *See* Compl. ¶ 6.

discount on labor charges when Doberstein paid in cash. G-P began work on the Project in November 2012. Defendants repeatedly assured Doberstein that the Project would be completed by the end of 2013.

Doberstein, who lives and works in Switzerland, began making monthly payments while abroad. On March 14, 2013, G-P sent Doberstein a $1,520 invoice for cabinet grade plywood. G-P had not yet begun construction on the portions of the Project that required the plywood, but purchased the plywood early because it was concerned that the cost would increase. Doberstein paid G-P to purchase the plywood in advance and store it until needed. Further, in that March 14 invoice and in an April 10, 2013 invoice, G-P offered Doberstein a three percent reduction on labor if she paid in cash directly to Greenplate. Doberstein paid a total amount of $33,950 in cash directly to Greenplate based on those two invoices.

### 2. Doberstein discovers issues with the Project's progress

In May 2013, Doberstein traveled from Switzerland to visit the Project site. Upon arrival, she discovered that little work had been completed, despite the fact that she had paid Defendants $127,820.10. After Doberstein returned to Switzerland, her interior designer, Matthew Pearson, spoke with Greenplate about the lack of progress. Greenplate explained that the Project had been delayed due to a lack of manpower, delays on other projects, and shuffling employees. He assured Pearson, however, that the Project still would be completed by the end of 2013.

On or about July 25 and 27, 2013, a neighbor, who also served as the president of the neighborhood homeowners' association, contacted Doberstein regarding the unkempt

3

state of her property. The neighbor informed Doberstein that little progress had been made on the Project in the past several months, even after the meetings Doberstein and Pearson had with Greenplate. Doberstein contacted Greenplate, demanding action. On August 9, 2013, Greenplate sent a letter to Doberstein's neighbors, explaining that the Project had been delayed due to weather and manpower issues and stating that "we did stop working there in early May . . . ."[3] Despite halting work on the Project, G-P had sent Doberstein invoices from May through August for a total amount of $49,500.

Later in August 2013, Pearson began meeting weekly at the Project site with Greenplate and insisted that G-P prepare a schedule of the work to be done. During those weekly meetings, Pearson observed three to six workers on the Project at any given time. Doberstein and Pearson later discovered that the Project was unmanned most of the week and that the number of workers was increased on days when Greenplate would meet with one of them.

### 3. The Project's completion date gets delayed

In September 2013, Doberstein learned that, contrary to her explicit instructions, Pearson had not been copied on the invoices sent to her by G-P and Greenplate. Doberstein reiterated her request for Pearson to be copied on all invoices. Later that month, during one of their weekly meetings, Greenplate revealed to Pearson that the Project would not be completed until the end of January 2014. Doberstein did not respond well to this news. To ameliorate her displeasure, Greenplate told Doberstein that

---

[3]    Compl. ¶ 12.

the Project would be substantially complete by the end of 2013, such that Doberstein could move in her things. Throughout the rest of 2013, G-P's invoicing accelerated in amount and frequency. By the end of December 2013, Doberstein had paid a total of $314,434.68 to G-P and Greenplate since the Project's inception, representing fifty-eight percent of the total $542,159 due under the Agreement, though the Project was nowhere near complete.

In January 2014, Pearson informed Greenplate that the Project had to be completed by March 1, because Doberstein's builders' risk insurance policy would expire on that date. After multiple requests from Pearson, Greenplate finally submitted a completion schedule, which contemplated a March 1 completion date. Greenplate then told Doberstein that G-P would need to bill every two weeks rather than monthly. As a result, Doberstein set up direct wire transfers from her bank account to G-P's account. Between January 1 and February 21, 2014, Doberstein paid an additional $146,930.34 via wire transfers to G-P. The Project's final invoice was issued to Doberstein on February 17, 2014 and was followed by G-P's urgent requests for payment over the following few days.

### 4. G-P goes out of business

On February 22, 2014, Doberstein, Pearson, Greenplate, and the flooring subcontractor met to discuss the Project. During the meeting, Greenplate admitted he would not have the Project complete by March 1, but promised Doberstein it would be complete by the end of April. Three days later, however, Greenplate fired G-P's employees and sent a letter to Doberstein and at least one other customer informing them

that G-P would be abandoning their renovations, because financially, it was unable to continue in business. The letter stated that G-P's financial troubles were due, in part, to its underbidding of the Project, late payments by customers, and increased costs. In March, Greenplate and G-P abandoned the Project altogether. In April, Todd Breck, A.I.A., P.E., of Breckstone Architecture, inspected the Project and estimated that, at the time, the value of the work in place was approximately $298,272.98. To date, Doberstein has paid Defendants a total of $461,365.02.

### C.  Procedural History

On August 2, 2014, Doberstein filed the Complaint against Greenplate and G-P. On October 2, 2014, Defendants moved to dismiss the Complaint and filed an opening brief on December 8. On July 10, 2015, after completion of the briefing, I heard oral argument on that motion. During argument, Doberstein voluntarily dismissed Counts VII, VIII, and IX of the Complaint.[4] This Memorandum Opinion constitutes my rulings on Defendants' motion to dismiss with respect to the Complaint's remaining six counts.

### D.  Parties' Contentions

Doberstein asserts six remaining counts against Defendants. In Count I, she seeks to pierce G-P's corporate veil and hold Greenplate personally liable for his fraudulent statements and misrepresentations to her. In Count II, Doberstein avers that Greenplate and G-P fraudulently concealed their plan to abandon the Project after she had paid in full

---

[4]    July 10 Arg. Tr. 7. Count VII was a claim for breach of the implied covenant of good faith and fair dealing, Count VIII a claim for conversion, and Count IX a claim for replevin. *See* Compl. ¶¶ 71-86.

under the Agreement. In Count III, Doberstein alleges Greenplate and G-P intentionally misrepresented the amount due under various invoices in order to extract unwarranted payments from her. In Count IV, Doberstein avers that Greenplate and G-P negligently misrepresented information regarding the status, completion, and billing of the Project. Count V asserts a claim against G-P for breach of an express contract, which Defendants do not contest in their motion. Finally, in Count VI, Doberstein alleges that Greenplate and G-P have been unjustly enriched by the amount they received from her for work they did not perform on the Project.

Defendants counter, pursuant to Rule 12(b)(6), that Counts I, IV, and VI should be dismissed for failure to state a claim that would entitle Doberstein to relief. Further, Defendants argue that if the equitable claims in Counts I, IV, and VI are dismissed under Rule 12(b)(6), the remaining claims, which are legal in nature, should be dismissed for lack of subject matter jurisdiction under Rule 12(b)(1). Alternatively, if I do not dismiss the remainder of the action for lack of subject matter jurisdiction, Defendants assert that Counts II and III should be dismissed for failure to state a claim upon which relief can be granted.

## II.    ANALYSIS

### A.    Counts I, IV, and VI Must Be Dismissed Under Rule 12(b)(6) for Failure to State a Claim

#### 1.    Legal standard

Pursuant to Rule 12(b)(6), this Court may grant a motion to dismiss for failure to state a claim if a complaint does not assert sufficient facts that, if proven, would entitle

the plaintiff to relief. As reaffirmed by the Delaware Supreme Court, "the governing pleading standard in Delaware to survive a motion to dismiss is reasonable 'conceivability.'"[5] That is, when considering such a motion, a court must "accept all well-pleaded factual allegations in the Complaint as true, . . . draw all reasonable inferences in favor of the plaintiff, and deny the motion unless the plaintiff could not recover under any reasonably conceivable set of circumstances susceptible of proof."[6] This reasonable "conceivability" standard asks whether there is a "possibility" of recovery.[7] If the well-pled factual allegations of the complaint would entitle the plaintiff to relief under a reasonably conceivable set of circumstances, the court must deny the motion to dismiss.[8] The court, however, need not "accept conclusory allegations unsupported by specific facts or . . . draw unreasonable inferences in favor of the non-moving party."[9] Moreover, failure to plead an element of a claim precludes entitlement to relief and, therefore, is grounds to dismiss that claim.[10]

Generally, the Court will consider only the pleadings on a motion to dismiss under

---

[5]    *Cent. Mortg. Co. v. Morgan Stanley Mortg. Capital Hldgs. LLC*, 27 A.3d 531, 537 (Del. 2011) (footnote omitted).

[6]    *Id.* at 536 (citing *Savor, Inc. v. FMR Corp.*, 812 A.2d 894, 896-97 (Del. 2002)).

[7]    *Id.* at 537 & n.13.

[8]    *Id.* at 536.

[9]    *Price v. E.I. duPont de Nemours & Co., Inc.*, 26 A.3d 162, 166 (Del. 2011) (citing *Clinton v. Enterprise Rent-A-Car Co.*, 977 A.2d 892, 895 (Del. 2009)).

[10]   *Crescent/Mach I P'rs, L.P. v. Turner*, 846 A.2d 963, 972 (Del. Ch. 2000) (Steele, V.C., by designation).

Rule 12(b)(6). "A judge may consider documents outside of the pleadings only when: (1) the document is integral to a plaintiff's claim and incorporated in the complaint or (2) the document is not being relied upon to prove the truth of its contents."[11]

## 2. Count I: piercing the corporate veil

Doberstein claims that, despite Greenplate's otherwise limited liability, I should pierce G-P's corporate veil and hold him individually liable for his allegedly fraudulent conduct. "To state a 'veil-piercing claim,' the plaintiff must plead facts supporting an inference that the corporation, through its alter-ego, has created a sham entity designed to defraud investors and creditors."[12] Specific facts a court may consider when being asked to disregard the corporate form include: "(1) whether the company was adequately capitalized for the undertaking; (2) whether the company was solvent; (3) whether corporate formalities were observed; (4) whether the dominant shareholder siphoned company funds; and (5) whether, in general, the company simply functioned as a facade for the dominant shareholder."[13] The decision to disregard the corporate entity "generally results not from a single factor, but rather some combination of them, and 'an overall element of injustice or unfairness must always be present, as well.'"[14] Most

---

[11] *Allen v. Encore Energy P'rs*, 72 A.3d 93, 96 n.2 (Del. 2013).

[12] *Crosse v. BCBSD, Inc.*, 836 A.2d 492, 497 (Del. 2003)

[13] *MicroStrategy Inc. v. Acacia Research Corp.*, 2010 WL 5550455, at *11 (Del. Ch. Dec. 30, 2010) (internal quotation marks and citation omitted).

[14] *Id.* (citing *EBG Hldgs. LLC v. Vredezicht's Gravenhage 109 B.V.*, 2008 WL 4057745, at *12 (Del. Ch. Sept. 2, 2008)).

9

importantly, "because Delaware public policy does not lightly disregard the separate legal existence of corporations, a plaintiff must do more than plead that one corporation is the alter ego of another in conclusory fashion in order for the Court to disregard their separate legal existence."[15]

Doberstein contends that her claim for veil-piercing is supported by her allegations that Greenplate repeatedly communicated false statements to her concerning the work being done at her property and that she relied on those statements to her detriment. She alleges that Greenplate and G-P increased the frequency and the amount of their billing during the last six weeks of the Project, despite the fact that they knew they shortly were going to abandon it and cease doing business.[16] According to Doberstein, because all the requisite elements of fraud are present, she has alleged a sufficient basis for disregarding the corporate identity of G-P and holding Greenplate personally liable. I disagree.

The case law governing veil-piercing requires me to consider whether the individual defendant—*i.e.*, Greenplate—abused the corporate form and, through that abuse, perpetrated fraud on an innocent third party—*i.e.*, Doberstein. It is not enough to allege, as Doberstein does, that Greenplate made fraudulent statements about his progress toward completing his contractual obligations. Those types of allegations may or may not support a claim for fraud, but Greenplate's wrongful acts must be tied to the

---

[15]     *Id.*

[16]     Compl. ¶¶ 41-42.

manipulation of the corporate form in order to make veil-piercing justifiable on grounds of equity. No such nexus is alleged here.

The Complaint alleges that Greenplate knew that G-P was going out of business and, therefore, induced Doberstein to make accelerated payments from January 1 to February 21, 2014, to extract as much money from her as possible. Doberstein has not pled, however, that Greenplate siphoned funds from G-P to himself during those last six weeks and thereby used the corporate form to shield those funds and himself from liability once G-P went out of business.[17] Absent such allegations, the Complaint states, at most, a claim for fraud against G-P due to actions taken by Greenplate on its behalf.[18] Because Doberstein failed to allege that Greenplate utlized G-P as a sham entity to defraud her, Count I must be dismissed for failure to state a claim.

---

[17] Although not discussed in the briefs, Doberstein alleges in the Complaint that Greenplate had her make direct payments to him in cash on two separate occasions in March and April 2013, Compl. ¶ 17, well before Greenplate allegedly knew of G-P's eventual demise. Although this allegation raises questions about Greenplate possibly siphoning off company funds, the Complaint does not plead facts satisfying the other four elements under *MicroStrategy* or demonstrating that an element of injustice or unfairness related to the corporate form of G-P was present during the March-April 2013 time period. The decision to disregard the corporate entity "generally results not from a single factor, but rather some combination of them, and 'an overall element of injustice or unfairness must always be present, as well.'" *MicroStrategy Inc.*, 2010 WL 5550455, at *11. Although Doberstein's allegations as to her two payments to Greenplate may establish a direct claim against him for fraud, they are insufficient, standing alone, to state a claim for piercing the corporate veil.

[18] I express no opinion as to whether Doberstein might have a claim directly against Greenplate for fraud.

11

### 3.     Count IV: negligent misrepresentation

Negligent misrepresentation—also known as "equitable fraud"—"is separate from, and broader, than common law fraud,"[19] such that "generally whatever amounts to common law fraud also amounts to equitable fraud."[20] "[T]o claim equitable fraud, 'the plaintiff need not show that a statement was made with knowledge that it was false or in reckless disregard of the truth,'"[21] as this Court generally "has not required a showing of scienter, 'reflecting its willingness to provide a remedy for negligent or innocent misrepresentation.'"[22]   Yet, "[e]quitable fraud is not available in every case or to every plaintiff.  It requires special equities, typically the existence of some form of fiduciary relationship, such as that between a director and stockholder or a trustee and *cestui que trust,* although other circumstances might be cited."[23]

Doberstein contends that because she contracted with G-P to complete renovation work at her property while she was living abroad, she was "relying" on Defendants in a special way and, therefore, can bring this claim for equitable fraud.  I do not find this

---

[19]     *Airborne Health, Inc. v. Squid Soap, LP*, 984 A.2d 126, 143 (Del. Ch. 2009).

[20]     *Narrowstep Inc. v. Onstream Media Corp.*, 2010 WL 5422405, at *13 (Del. Ch. Dec. 22, 2010).

[21]     *Airborne Health, Inc.*, 984 A.2d at 144 (citing DONALD J. WOLFE, JR. & MICHAEL A. PITTENGER, CORPORATE AND COMMERCIAL PRACTICE IN THE DELAWARE COURT OF CHANCERY § 2.03[b][1], at 2-33 (2009)).

[22]     *Narrowstep Inc.*, 2010 WL 5422405, at *13 (quoting *Airborne Health, Inc.*, 984 A.2d at 144).

[23]     *Id*. (citing *U.S. West, Inc. v. Time Warner, Inc.*, 1996 WL 307445, at *24 (Del. Ch. June 6, 1996) (Allen, C.)).

argument persuasive. Sophisticated[24] contractual parties who bargain at arm's length generally do not qualify for the kind of equitable protection that the negligent misrepresentation doctrine envisions in this regard.[25] The "special equities" that can provide a basis for equitable fraud are relationships more akin to fiduciary duties or trustee relationships. In this case, Doberstein entered into a contract for a major home renovation. Even though she was living abroad, Doberstein still periodically checked in on the progress of that Project. Moreover, Doberstein alleges that her designer, Pearson, was located in the vicinity of the property, monitored the progress of Defendants' work more closely, and reported back to her.[26] Nothing in the Complaint suggests that the relationship between Doberstein and Defendants was anything but a typical contractual relationship. The obligations owed to Doberstein, therefore, were contractual in nature, and her remedy for breaches of those obligations can be obtained through an action sounding in contract. As a result, the Complaint fails to state a claim for negligent misrepresentation.

### 4. Count VI: unjust enrichment

Unjust enrichment is the "'unjust retention of a benefit to the loss of another, or the retention of money or property of another against the fundamental principles of

---

[24] Although there is no indication in the Complaint that Doberstein herself was a sophisticated party as to the subject matter of the Agreement, the assistance she received throughout the relevant period from Pearson likely qualifies her as such.

[25] *Id*.; *see also Osram Sylvania Inc. v. Townsend Ventures, LLC*, 2013 WL 6199554, at *15 (Del. Ch. Nov. 19, 2013).

[26] *See, e.g.*, Compl. ¶¶ 6-11; Pl.'s Answer Br. 3.

justice or equity and good conscience.'"[27]   Unjust enrichment, or "quasi-contract," developed "as a theory of recovery to remedy the absence of a formal contract."[28]   When a complaint alleges an express, enforceable contract that controls the parties' relationship, a claim for unjust enrichment will be dismissed because the "contract is the measure of plaintiffs' right."[29]

Defendants contend that because Doberstein pleads a breach of the Agreement in Count V, that contract is the measure of her rights.   That is, because there is no independent basis upon which the unjust enrichment claim could proceed, it should be dismissed.   Doberstein responds that her unjust enrichment claim is pled in the alternative to the breach of contract claim and that all the elements of unjust enrichment have been pled.

"A claim for unjust enrichment is not available if there is a contract that governs the relationship between parties that gives rise to the unjust enrichment claim."[30] Doberstein has not identified any factual basis for her unjust enrichment claim independent of the allegations relating to her breach of contract claim.   Indeed, in her brief, Doberstein states that she "has lost on the deal given that she paid the full amount due under the [Agreement], $494,498.00, only to be left with an [un]inhabitable home

---

[27]   *Kuroda v. SPJS Hldgs., L.L.C.*, 971 A.2d 872, 891-92 (Del. Ch. 2009).

[28]   *Choupak v. Rivkin*, 2015 WL 1589610, at *20 (Del. Ch. Apr. 6, 2015).

[29]   *Wood v. Coastal States Gas Corp.*, 401 A.2d 932, 942 (Del. 1979).

[30]   *Kuroda*, 971 A.2d at 891.

14

. . . ."[31] Thus, by her own assertions, the unjust enrichment claim relies on the same damages as the breach of contract claim. In those circumstances, I conclude that Count V cannot be maintained, because the Agreement provides the measure of Doberstein's rights here. Thus, Doberstein's unjust enrichment claim also must be dismissed under Rule 12(b)(6).

**B.** **The Remaining Counts Must be Dismissed Under Rule 12(b)(1) for Lack of Subject Matter Jurisdiction**

**1.** **Legal standard**

The Court of Chancery will dismiss an action under Rule 12(b)(1) "if it appears from the record that the Court does not have subject matter jurisdiction over the claim."[32] The plaintiff "bears the burden of establishing this Court's jurisdiction, and where the plaintiff's jurisdictional allegations are challenged through the introduction of material extrinsic to the pleadings, he must support those allegations with competent proof."[33]

---

[31] Pl.'s Answer Br. 23.

[32] *AFSCME Locals 1102 & 320 v. City of Wilm.,* 858 A.2d 962, 965 (Del. Ch. 2004) (internal citation omitted).

[33] *Yancey v. Nat'l Trust Co.*, 1993 WL 155492, at *6 (Del. Ch. May 7, 1993) (internal citation omitted).

This Court is one of limited jurisdiction.[34] It can acquire subject matter jurisdiction over a case in three ways: (1) an invocation of an equitable right;[35] (2) a request for an equitable remedy when there is no adequate remedy at law;[36] or (3) a statutory delegation of subject matter jurisdiction.[37] This Court "will not exercise subject matter jurisdiction where a complete remedy otherwise exists but where plaintiff has prayed for some type of traditional equitable relief as a kind of formulaic 'open sesame' to the Court of Chancery."[38]

---

[34] The issue of subject matter jurisdiction is so crucial that it may be raised at any time before final judgment. *See Appoquinimink Educ. Ass'n v. Appoquinimink Sch. Dist.*, 2003 WL 1794963, at *3 n.24 (Del. Ch. Mar. 31, 2003).

[35] *See* 10 *Del. C.* § 341 ("The Court of Chancery shall have jurisdiction to hear and determine all matters and causes in equity."); *Christiana Town Ctr. LLC v. New Castle Cty.*, 2003 WL 21314499, at *3 (Del. Ch. June 6, 2003) ("Equitable rights are rights that have traditionally not been recognized at common law. The most common example of equitable rights in this court are fiduciary rights and duties that arise in the context of trusts, corporations, other forms of business organizations, guardianships, and the administration of estates."); *Azurix Corp. v. Synagro Techs., Inc.*, 2000 WL 193117, at *2 (Del. Ch. Feb. 3, 2000).

[36] 10 *Del. C.* § 342 ("The Court of Chancery shall not have jurisdiction to determine any matter wherein sufficient remedy may be had by common law, or statute, before any other court or jurisdiction of this State."); *Christiana Town Ctr.*, 2003 WL 21314499, at *3 ("Equitable remedies . . . may be applied even where the right sued on is essentially legal in nature, but with respect to which the available remedy at law is not fully sufficient to protect or redress the resulting injury under the circumstances.") (internal quotation marks omitted).

[37] *See Candlewood Timber Gp., LLC v. Pan Am. Energy, LLC*, 859 A.2d 989, 997 (Del. 2004).

[38] *Christiana Town Ctr.*, 2003 WL 21314499, at *3 (quoting *IBM Corp. v. Comdisco, Inc.*, 602 A.2d 74, 78 (Del. Ch. 1991)).

16

The party seeking a court's intervention bears the burden of establishing the court's subject matter jurisdiction,[39] and the court may consider evidence outside the pleadings in resolving that issue.[40] Further, "[i]n deciding whether or not equitable jurisdiction exists, the Court must look beyond the remedies nominally being sought, and focus upon the allegations of the complaint in light of what the plaintiff really seeks to gain by bringing his or her claim."[41] In other words, "the court must address the nature of the wrong alleged and the available remedy to determine whether a legal, as opposed to an equitable remedy, is available and sufficiently adequate."[42]

Further, "[t]he Court of Chancery . . . routinely decides controversies that encompass both equitable and legal claims."[43] "[I]f a controversy is vested with equitable features which would support Chancery jurisdiction of at least part of the controversy,

---

[39] *Maloney-Refaie v. Bridge at Sch., Inc.*, 2008 WL 2679792, at *7 (Del. Ch. July 9, 2008) (quoting *Ropp v. King*, 2007 WL 2198771, at *2 (Del. Ch. July 25, 2007)).

[40] Ct. Ch. R. 12(b)(1); *Sloan v. Segal*, 2008 WL 81513, at *6 (Del. Ch. Jan. 3, 2008) (citing *Simon v. Navellier Series Fund*, 2000 WL 1597890, at *5 (Del. Ch. Oct. 19, 2000)); *see also Maloney-Refaie*, 2008 WL 2679792, at *7 (citing *NAMA Hldgs., LLC v. Related World Mkt. Ctr., LLC*, 922 A.2d 417, 429 n.15 (Del. Ch. 2007)).

[41] *Candlewood Timber Gp.*, 859 A.2d at 997; *see also Diebold Computer Leasing, Inc. v. Commercial Credit Corp.*, 267 A.2d 586, 588 (Del. 1970).

[42] *IMO Indus., Inc. v. Sierra Int'l, Inc.*, 2001 WL 1192201, at *2 (Del. Ch. Oct. 1, 2001).

[43] *Nicastro v. Rudegeair,* 2007 WL 4054757, at *2 (Del. Ch. Nov. 13, 2007) (citing WOLFE & PITTENGER, *supra* note 19, § 2-4 (supp. 2006) ("It is not at all unusual for cases properly within the subject matter jurisdiction of the Court of Chancery to involve both legal and equitable claims.")).

17

then the Chancellor *has discretion* to resolve the remaining portions of the controversy as well."[44]  "Once the Court determines that equitable relief is warranted, even if subsequent events moot all equitable causes of action or if the court ultimately determines that equitable relief is not warranted, the court retains the power to decide the legal features of the claim pursuant to the cleanup doctrine."[45]

### 2. Counts II, III, and V: legal claims

Defendants contend, and Doberstein does not dispute, that Counts II, III, and V of her Complaint are legal claims.  Moreover, the harms for which Doberstein seeks relief in the case of each of these claims can be remedied by money damages.  Thus, there is no basis on which this Court could assert subject matter jurisdiction over one or more of these claims independently of the claims asserted in the other counts.  If any of Doberstein's equitable claims were well-pled, I would have had discretion to resolve these legal claims under the so-called "cleanup doctrine."[46]  Because I do not see a colorable equitable hook in any of the equitable claims Doberstein advanced in Counts I, IV, and VI, however, I do not consider it appropriate for this Court to retain jurisdiction

---

[44]  *Getty Ref. & Mktg. Co. v. Park Oil, Inc.*, 385 A.2d 147, 149 (Del. Ch. 1978) (emphasis added).

[45]  *Prestancia Mgmt. Gp. v. Va. Heritage Found., II LLC*, 2005 WL 1364616, at *11 (Del. Ch. May 27, 2005) (internal quotation marks omitted) (quoting *Beal Bank SSB v. Lucks*, 2000 WL 710194, at *2 (Del. Ch. May 23, 2000)).

[46]  *Darby Emerging Mkts. Fund, L.P. v. Ryan*, 2013 WL 6401131, at *6 (Del. Ch. Nov. 27, 2013) ("[I]f a controversy is vested with equitable features which would support Chancery jurisdiction of at least part of the controversy, then the Chancellor *has discretion* to resolve the remaining portions of the controversy as well.").

over this action.  For that reason, and without expressing any opinion as to the merits of any of the remaining claims, I grant Defendants' motion to dismiss for lack of jurisdiction as to Counts II, III, and V.

## III.    CONCLUSION

For the foregoing reasons, Defendants' motion to dismiss for failure to state a claim as to Counts I, IV, and VI is granted under Rule 12(b)(6).  I also grant Defendants' motion to dismiss Counts II, III, and V for lack of subject matter jurisdiction under Rule 12(b)(1).  Counts I, IV, and VI are dismissed with prejudice.  As to Counts II, III, and V, Plaintiff may file within 60 days of the date of this Memorandum Opinion and Order a written election to transfer this action to an appropriate court for hearing and determination.  If no such written election is filed within 60 days, this action will be dismissed without prejudice.

**IT IS SO ORDERED.**